UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ASHLEY KINCAID EVE and | ) | |
| CASEY WILSON | ) | |
| | ) | Case No. 1:21-cv-1721 |
| Plaintiffs, | ) | |
| | ) | JURY DEMANDED |
| v. | ) | |
| | ) | |
| WADE BURTRON, TAYLOR | ) | |
| MCCORKLE, JOSH HARREL, | ) | |
| OFFICER THOMAS, | ) | |
| JOHN DOE OFFICERS 1-10, | ) | |
| CITY OF WESTFIELD, | ) | |
| WESTFIELD POLICE DEPARTMENT, | ) | |
| and JOEL RUSH, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT FOR DAMAGES AND JURY DEMAND

---

Is it permissible for the government to deny the subject of a criminal investigation the right to consult a lawyer and arrest that lawyer for giving legal advice at a crime scene? The answer must surely be **NO**.

### I.   PARTIES

1.   Plaintiff Ashley Kincaid Eve is a natural person, a citizen of the United States, a resident of Marion County, Indiana, and at all relevant times a licensed attorney in the State of Indiana. She may be served through her attorneys, whose contact information is found below.

2.   Plaintiff Casey Wilson is a natural person, a citizen of the United States, and a resident of Hamilton County, Indiana. She may be served through her attorneys whose contact information is found below.

3.   Defendant Wade Burtron ("Officer Burtron") is a natural person, who, at all relevant times was, and on information and belief still is, a police officer for the Westfield Police Department located in Hamilton County, Indiana.

4.   Taylor McCorkle ("Officer McCorkle") is a natural person, who, at all relevant times was, and on information and belief still is, a police officer for the Westfield Police Department located in Hamilton County, Indiana.

5.   Josh Harrel ("Officer Harrel") is a natural person, who, at all relevant times was, and on information and belief still is, a police officer and supervisor for the Westfield Police Department located in Hamilton County, Indiana.

6.   Officer Thomas ("Officer Thomas") is a natural person, who, at all relevant times was, and on information and belief still is, a police officer for the Westfield Police Department located in Hamilton County, Indiana.

7.   John Doe Officers 1-10 are law enforcement officers in the State of Indiana. Their names are unknown at this time; however, the complaint will be amended once they are identified.

8.   City of Westfield ("Westfield") is responsible for the conduct of Defendant Westfield Police Department ("WPD"), which is a police force located in Hamilton County, Indiana.

9.  Joel Rush is the present Chief of Police for the WPD. He is being sued in his official capacity.

10. City of Westfield can be served at 130 Penn Street, Westfield, IN 46074.

11. All WPD defendants can be served at the Westfield Public Safety Building, 17535 Dartown Road, Westfield, IN 46074.

## II.  JURISDICTION AND VENUE

12. Attorney Ashley Kincaid Eve is seeking relief for the violation of the rights guaranteed to her by the U.S. Constitution and is bringing her claims pursuant to 42 U.S.C. § 1983; therefore, federal question jurisdiction exists pursuant to 28 U.S.C. § 1331.

13. Plaintiff Casey Wilson is seeking relief for the violation of the rights guaranteed to her by the U.S. Constitution and is bringing her claims pursuant to 42 U.S.C. § 1983; therefore, federal question jurisdiction exists pursuant to 28 U.S.C. § 1331.

14. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Ms. Kincaid Eve's state law claim.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## III.  FACTS

16. This action arises from the arrest of a lawyer for giving legal advice to her friend while she was being detained during a criminal investigation.

17. On June 16, 2019, Ms. Kincaid Eve was the passenger in a vehicle that was pulled over by Officer Burtron.

18. The vehicle was being driven by Casey Wilson, Ms. Kincaid Eve's friend.

3

19. This entire traffic stop and subsequent wrongful arrest were recorded on video attached to this complaint. See Exhibit A.[1]

20. According to Officer Burtron, he pulled Ms. Wilson over for unsafe lane movements, among other reasons.

21. After informing Ms. Wilson why he had pulled her over, Officer Burtron began conducting what he referred to as "pre-exit" sobriety tests.

22. Ms. Kincaid Eve had just taken and passed the Indiana Bar Exam that was administered in February 2019.

23. She was sworn into the Indiana Bar on May 14, 2019.

24. From May 2018 until January 2019, Ms. Kincaid Eve was a certified legal intern with the Marion County Public Defender Agency.

25. As part of her duties, Ms. Kincaid Eve managed her own caseload of misdemeanor cases under the supervision of a public defender.

26. Approximately half of Ms. Kincaid Eve's cases were for operating a vehicle under the influence.

27. Ms. Kincaid Eve was known for her thorough preparation of her cases, which included in-depth knowledge of legal issues related to her cases.

28. Through her training and experience, Ms. Kincaid Eve was familiar with field sobriety tests, as well as the rights of individuals when confronted and questioned by the police.

---

[1] Due to the size of the videos, counsel has uploaded them this website to be viewed: https://sllawfirm.box.com/s/8c6aq02k4s4n0tdhnip45mnyk4i9crxq.
Counsel is happy to provide a physical copy of these videos if requested.

29. Ms. Kincaid Eve observed that these tests were not presented to Ms. Wilson as voluntary.

30. While Ms. Kincaid Eve knew these tests were voluntary, she did not believe that Ms. Wilson realized these tests were voluntary.

31. Ms. Kincaid Eve also knew these tests did not have the scientific reliability of standardized field sobriety tests.

32. Because of this, she was concerned about their admissibility in court.

33. Ms. Wilson completed the "pre-exit" tests.

34. Ms. Wilson did not know the "pre-exit" tests were voluntary.

35. Ms. Wilson did not know what her rights were in the situation.

36. While she observed the interaction between Ms. Wilson and Officer Burtron, Ms. Kincaid Eve knew Ms. Wilson was incriminating herself.

37. However, Ms. Wilson did not ask Ms. Kincaid Eve any questions, so Ms. Kincaid Eve did not insert herself into the situation.

38. Ms. Kincaid Eve remained silent in the passenger seat as the "pre-exit" tests were conducted.

39. As Ms. Wilson was completing the pre-exit tests, Officer Burtron called for backup.

40. It was clear to Ms. Kincaid Eve that Ms. Wilson would be arrested that evening, and that she would not be free to leave the scene.

41. After Officer Burtron completed the pre-exit tests, he asked Ms. Kincaid Eve and the other backseat passenger, Amber Kincaid, if they had their identifications.

42. Wanting to know why the officer was asking for her identification, Ms. Kincaid Eve informed Officer Burtron for the first time that she was an attorney.

43. He replied he did not need their identifications, but that he was just going to check them anyway.[2]

44. Ms. Kincaid Eve then gave her identification to Officer Burtron.

45. And anticipating that Ms. Wilson would ask her for advice, she reiterated to Officer Burtron that she was a lawyer because she knew her status as a lawyer could be verified through an online public records check.

46. Officer Burtron replied that it would not matter.

47. Ms. Kincaid Eve only asked the single question regarding why Officer Burtron needed her identification.

48. Officer Burtron ran the three women's information through his system to see if any of them had a warrant or criminal history.

49. Officer Burtron did not verify Ms. Kincaid Eve's status as an attorney.

50. While Officer Burtron was conducting his checks, Ms. Wilson asked Ms. Kincaid Eve for legal advice about what to do next.

51. Ms. Kincaid Eve rendered legal advice.

52. Ms. Wilson was confused about which tests and questions she had the right to refuse, and which tests and questions she did not have the right to refuse.

---

[2] "Checking" identifications typically means that the officer will input the person's information into their system to verify if the person has any outstanding warrants or other criminal history.

53. Ms. Wilson asked Ms. Kincaid Eve to represent her during the course of the investigation.

54. Ms. Kincaid Eve agreed.

55. While Ms. Kincaid Eve had consumed alcohol that evening (a fact she openly admitted to Officer Burtron), she still knew Ms. Wilson's rights.

56. The U.S. Supreme Court has upheld the convictions of persons whose lawyers were intoxicated during their trials.

57. The U.S. Supreme Court has permitted the executions of people whose lawyers were intoxicated during their trials.

58. Ms. Wilson had an immediate need for legal advice as she was being detained and an arrest was imminent.

59. Ms. Wilson knew how much Ms. Kincaid Eve had to drink that night.

60. Ms. Wilson was also aware of Ms. Kincaid Eve's expertise in criminal law.

61. Ms. Wilson and Ms. Kincaid Eve were college roommates.

62. Ms. Wilson had full faith in Ms. Kincaid Eve's ability to give her legal advice at the scene of the crime and would rather have Ms. Kincaid Eve's assistance than no assistance at all.

63. Ms. Wilson and Ms. Kincaid Eve discussed how it would be in Ms. Wilson's best interests to exercise her right to remain silent and that Ms. Kincaid Eve would primarily communicate with the Officers on Ms. Wilson's behalf.

64. Officer McCorkle arrived on the scene while Ms. Wilson and Ms. Kincaid Eve were talking in Ms. Wilson's vehicle.

65. While Officer Burtron was briefing Officer McCorkle about the situation, he heavily misrepresented his interactions with Ms. Kincaid Eve.

66. Officer Burtron told Officer McCorkle that Ms. Kincaid Eve was "claiming" to be a lawyer because "that's her thing."

67. Officer Burtron claimed Ms. Kincaid Eve was asking "all sorts of questions" when in fact she had asked one question.

68. Ms. Kincaid Eve had complied with Burtron's request for her identification and there was zero evidence that she had done anything illegal or was otherwise involved in any criminal activity.

69. He heavily implied that Ms. Kincaid Eve was not in fact a lawyer, despite failing to verify her status as a lawyer.

70. The Indiana Roll of Attorneys is public record, and can be accessed from the computer in Officer Burtron's patrol vehicle, or even on a smart phone.

71. Ms. Kincaid Eve's attorney status could be verified in these ways in approximately 30-60 seconds.

72. Officer Burtron predicted to Officer McCorkle that there would be two arrests, implying Ms. Kincaid Eve's and Ms. Wilson's.

73. Officer Burtron and Officer McCorkle then reapproached the vehicle and asked Ms. Wilson to step out.

74. At this time, Ms. Kincaid Eve informed the Officers that she was Ms. Wilson's attorney, and asked them why they wanted Ms. Wilson to step out of the vehicle.

75. They responded it was for sobriety tests and Ms. Kincaid Eve responded that would be fine, but that she would be stepping out too, as she was Ms. Wilson's lawyer.

76. Officer Burtron informed Ms. Kincaid Eve he would not allow her to step out of the vehicle during a "criminal investigation."

77. Ms. Wilson was not free to leave the scene as she was the subject of a criminal investigation.

78. As was clearly established in the landmark Supreme Court Case *Miranda v. Arizona,* everyone in America is guaranteed the right to have a lawyer present during a criminal investigation. 384 U.S. 436 (1966).

79. The US Supreme Court has made clear that the right to a lawyer attaches when an individual is not free to leave the scene.

80. Ms. Wilson continuously looked to Ms. Kincaid Eve for advice and clearly stated she did not know what she should do.

81. Officer Burtron "commands" Ms. Wilson out of the vehicle.

82. Ms. Wilson had the right to a lawyer during the criminal interrogation.

83. At some point, Officer Thomas and other officers arrived at the scene.

84. Ms. Kincaid Eve informed the officers loudly so that all those present would be aware of her movements and that she would be getting out of the vehicle.

85. She was not under suspicion of a crime.

86. Her hands were visible.

87. She made no furtive movements.

88. She communicated her intentions that she would be present while the police interrogated her client.

89. She then attempted to open the passenger door, by using her foot to push it open because she was holding her hands up and was recording the interaction with her cell phone.

90. Also, because of her short stature, Ms. Kincaid Eve regularly uses her foot to open all car doors--especially SUVs—like the vehicle Ms. Wilson was driving that night.

91. Officer McCorkle held the door closed, preventing Ms. Kincaid Eve from exiting the vehicle.

92. Ms. Kincaid Eve informed the officers they were violating her client's rights as well as her own.

93. At this time, Ms. Kincaid Eve was under no suspicion of a crime and she was (legally and theoretically) free to leave the scene.

94. There was no curfew in place and she was free to walk down the side of the road if she so chose.

95. They were approximately one mile from Amber Kincaid and Ms. Wilson's house, which was their destination.

96. When she attempted to open the door again, Officer Burtron yelled from the driver's door, "just get her out and detain her."

97. At that time, Officer McCorkle fully opened the partially open driver's door he had been holding closed and pulled Ms. Kincaid Eve out of the vehicle.

98. He then forcibly placed her in handcuffs with the help of Officer Thomas.

99. Clear plastic wrap covered a fresh tattoo on Ms. Kincaid Eve's wrist and was plainly visible to the officers as they tightened the metal handcuffs around her wrists and over the wrap.

100.     This illegal detention left substantial bruising and caused pain.

101.     When Officer McCorkle attempted to place Ms. Kincaid Eve into his police vehicle, she refused to get into the police car.

102.     Ms. Kincaid Eve said she didn't have to and asked why she was being arrested.

103.     Officer McCorkle replied that she wasn't being arrested, just "detained."

104.     Ms. Kincaid Eve asked why she was being detained, and he replied it was because they (Burtron and McCorkle) weren't doing the "side of the road lawyering."

105.     Ms. Kincaid Eve informed him that that was not his right to decide.

106.     He made no mention of a battery or that he was in pain.

107.     Ms. Kincaid Eve was then forced into the front seat of the police car.

108.     During this time, Officer Harrel, a supervisor, arrived on scene.

109.     Officer Burtron took it upon himself to ask Officer Thomas if the door hit him when Ms. Kincaid Eve tried to get out.

110.     Officer Burtron began explaining what happened, and said that Ms. Kincaid Eve had been screaming, yelling and acting belligerent as well as talking over the officers.

111.     Officer Harrel asked if there was probable cause for arrest.

112.     Officer Burtron then suggested to Officer Harrel that the car door "probably" hit Officer McCorkle.

113.     Officer McCorkle then said the door "sort of" hit him.

114.     He failed to state that he was following the directives of Officer Burtron while standing in front of Ms. Kincaid Eve's door.

115.     Officer Harrel then told the officers to take Ms. Kincaid Eve to jail because she "didn't need to be there", despite the continued criminal investigation of Ms. Wilson, who, through her attorney, had asserted both her right to remain silent and her right to have a lawyer present during a "criminal investigation."

116.     Officer Harrel spoke with Ms. Kincaid Eve about the situation before she was transported to jail.

117.     Officer Harrel told Ms. Kincaid Eve that if she was a lawyer like she claimed she was then she would have a chance to argue her case in court.

118.     He also implied that she was not a real lawyer.

119.     Officer Harrel took no steps to determine whether Ms. Kincaid Eve was in fact a lawyer, despite the information being publicly available online.

120.     Ms. Kincaid Eve was charged with a felony battery on police officer and resisting law enforcement and disorderly conduct as misdemeanors.

121.     Officer Harrel (and the other officers on scene) were aware that simply facing a criminal charge can have permanent and catastrophic consequences on individuals.

122.     They were aware that the consequences are likely to be more severe when the individual is charged with a felony and even more severe when charged with a violent felony.

123.     They were also aware that lawyers are held to a higher standard than the general public and knew or should have known that facing a felony battery charge would carry professional consequences to Ms. Kincaid Eve.

124.     They were also aware that Ms. Kincaid Eve's DNA would be collected and stored in the felon database.

125.     They were aware that she would be subject to incarceration at the Hamilton County Jail.

126.     Hamilton County has a policy where individuals charged with battery are held for a minimum of 24 hours.

127.     They were aware that her mug shot would be taken and publicly posted.

128.     They were aware that pictures would be taken of any tattoos she had and that this could be an invasive and humiliating process.

129.     Meanwhile, after transporting Ms. Kincaid Eve to jail, Officer Burtron resumed the criminal investigation of Ms. Wilson.

130.     She was clearly distraught that her friend and lawyer had just been arrested.

131.     Ms. Wilson completed the requested sobriety tests.

132.     When Officer Burtron read her the implied consent card and requested she take a certified breath test.

133.     Ms. Wilson was confused on if she should take the test.

134.     Her lawyer had been taken to jail, so she yelled up to the remaining passenger in the vehicle to ask if she should take the test.

135.     Ultimately, Ms. Wilson agreed to take the test.

136.     She was then placed in handcuffs and then placed in Officer Burtron's patrol vehicle.

137.     Officer Burtron never read Ms. Wilson her *Miranda* warnings, as the law requires when a person is arrested for a crime.

138.     While on the way to the jail for the blood draw, Officer Burtron continued to ask Ms. Wilson questions.

139.     He used some of the information gleaned from these questions to write Ms. Wilson additional citations.

140.     After arriving at the jail, and despite Ms. Wilson already agreeing to submit to the certified chemical test, Officer Burtron asked Ms. Wilson again if she wanted to take the certified breath test.

141.     Ms. Wilson then asked Officer Burtron questions about the test.

142.     Because of her confusion, Ms. Wilson indicated she was not sure if she wanted to take it.

143.     Officer Burtron still had not advised Ms. Wilson of her *Miranda* rights.

144.     He interpreted her confusion as a refusal and submitted a warrant request for a blood draw, which was granted.

145.    A refusal to take a chemical breath test has serious consequences, including a two-year automatic license suspension.

146.    Ms. Wilson was then escorted into the jail by Officer Burtron for a nurse to perform the blood draw, which occurred at 2:03am.

147.    Officer Butron decided to use 2:03 a.m. as his arrest time, which  was 92 minutes after he pulled Ms. Wilson over.

148.    Ms. Wilson was then processed at the Hamilton County Jail.

149.    She was in the cell next to Ms. Kincaid Eve.

150.    Because Ms. Wilson was not facing battery charges, she was released 12 hours before Ms. Kincaid Eve.

151.    This caused Ms. Wilson to feel extreme guilt and anguish.

152.    Ms. Wilson felt responsible for Ms. Kincaid Eve's arrest.

153.    Ms. Wilson believed she had destroyed Ms. Kincaid Eve's career.

154.    Ms. Wilson had agreed to be Ms. Kincaid Eve's designated driver that night.

155.    They were celebrating Ms. Kincaid Eve's becoming an attorney.

156.    Ms. Wilson knew how hard Ms. Kincaid Eve worked to become an attorney.

157.    She knew it had been her dream since 2008, when they lived together.

158.    Ms. Wilson was ashamed of her criminal actions on the night of her arrest and accepted responsibility through a plea agreement.

159.     But the guilt and shame she felt for her actions were substantially exacerbated by the guilt of watching her college roommate, friend, and lawyer get arrested and charged with a more serious crime than her.

160.     Ms. Wilson's license was also suspended as a result of her "refusal" to submit the chemical test.

161.     Had she had access to counsel, as was her right guaranteed by the Constitution, Ms. Wilson would not have been confused about whether she should have taken the test and would have submitted voluntarily to the test.

162.     Different drafts of Officer McCorkle's probable cause affidavits demonstrate how his story evolved to maximize the possible charges against Ms. Kincaid Eve.

163.     Ms. Kincaid Eve was required to inform her new employer, the Marion County Public Defender Agency, of her arrest the following morning.

164.     News of her arrest quickly spread around the agency.

165.     Her colleagues had easy access to Officer McCorkle's filed probable cause affidavit.

166.     This substantially harmed her reputation with her new employer and colleagues.

167.     This caused extreme emotional distress and fear.

168.     When the Trump administration resumed federal executions at an unprecedented rate, and after organizing and launching a successful lawsuit against the Indiana State Police for violating anti-death penalty protesters First Amendment Rights,

Ms. Kincaid Eve left her job as a public defender to work to abolish the death penalty full-time.

169.     This includes representation of individuals on federal death row.

170.     Some of her clients have found out about her arrest, which has harmed her reputation with those clients.

171.     Ms. Kincaid Eve has suffered, and continues to suffer, substantial harm from this unlawful arrest, including harm to her professional reputation, emotional distress, Post Traumatic Stress Disorder (PTSD), physical injuries, financial harm, attorney fees, attorney discipline through the Indiana Bar, and restrictions on her liberty for both her pre-trial detention, pre-trial release conditions, and the conditions of her diversion agreement with the State of Indiana. See Exhibit B.

## IV.     CAUSES OF ACTION

### Count 1: Violations of the 4th and 14th Amendments to the U.S. Constitution
### (42 U.S.C. § 1983)
(*Kincaid Eve v. Burtron, McCorkle, Thomas, Harrel, Does 1-10*)

172.     Plaintiffs incorporate the foregoing paragraphs by reference as though fully restated herein.

173.     Defendants McCorkle, Burtron, Thomas, Harrel, and Does used excessive force against Ms. Kincaid Eve.

174.     Defendants McCorkle, Burtron, Thomas, Harrel, and Does violated Ms. Kincaid Eve's Fourth Amendment and unreasonably seized her.

175.     Defendants McCorkle, Burtron, Thomas, Harrel, and Does continued to violate Ms. Kincaid Eve's Fourth Amendment right by unreasonably restricting her liberty and keeping her in jail for 24 hours.

176.     Defendants McCorkle, Burtron, Thomas, Harrel, and Does did not have probable cause to arrest Ms. Kincaid Eve.

177.     Defendants McCorkle, Burtron, Thomas, Harrel, and Does seized, detained, and arrested Ms. Kincaid Eve without due process as required by the Fourteenth Amendment to the United States Constitution.

## Count 2: Violations of the 1st Amendment to the U.S. Constitution
## (42 U.S.C. § 1983)
*(Kincaid Eve v. Burtron, McCorkle, Thomas, Harrel, Does 1-10)*

178.     Plaintiffs incorporate the foregoing paragraphs by reference as though fully restated herein.

179.     Ms. Kincaid Eve's "side-of-the-road lawyering" is protected speech under the First Amendment.

180.     Defendants McCorkle, Burtron, Thomas, Harrel, and Does violated Ms. Kincaid Eve's First Amendment right to free speech when they detained and punished her for giving and/or attempting to give her friend legal advice while her friend was being interrogated by the police.

181.     These defendants' actions in detaining and arresting Ms. Kincaid Eve were meant to deter protected First Amendment activity in the future.

## Count 3: *Monell* Violations of the U.S. Constitution (42 U.S.C. § 1983)
*(Kincaid Eve v. City of Westfield, WPD, and Joel Rush)*

182.     Plaintiffs incorporate the foregoing paragraphs as though fully restated herein.

183.     Defendants City of Westfield, WPD, and Joel Rush lacked adequate policies and procedures to protect innocent people from excessive and unwarranted force by individual officers.

184.     Defendants City of Westfield, WPD, and Joel Rush lacked adequate policies and procedures to protect the First Amendment rights of citizens.

185.     Defendants City of Westfield, WPD, and Joel Rush maintained a custom or practice of allowing their officers to be under-trained, under-prepared, and/or overly hostile and aggressive.

186.     It was dark outside when only male officers responded to a situation involving only females.

187.     The male to female, police to suspect ratios were highly intimidating and caused duress.

188.     Defendants City of Westfield, WPD, and Joel Rush lacked adequate policies and procedures, or lacked staffing to support appropriate policies and procedures, to ensure that female officers responded to situations involving female suspects (or female passengers in cars, as the case may be).

189.     Defendants City of Westfield, WPD, and Joel Rush's policies, practices, and customs (and/or lack thereof) violated Ms. Eve Kincaid's rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

190.      Ms. Eve Kincaid was damaged by these defendants' policies, practices, and customs, and/or lack thereof.

### Count 4: Failure to Intervene (42 U.S.C. § 1983)
*(Kincaid Eve v. McCorkle, Thomas, Harrel, Does 1-10)*

191.      Plaintiffs incorporate the foregoing paragraphs as though fully restated herein.

192.      Officer Burtron can be seen and heard on the recording suggesting that Ms. Eve Kincaid had used her door to batter an officer.

193.      Officers McCorkle, Thomas, Harrel, and Does 1-10 knew that Officer Burtron was fabricating probable cause against Ms. Eve Kincaid so that she could be arrested.

194.      Officers McCorkle, Thomas, Harrel, and Does 1-10 knew that Officer Burtron did not want Ms. Kincaid Eve to give the driver of the vehicle legal advice.

195.      Officers McCorkle, Thomas, Harrel, and Does 1-10, and each of them, knew that Officer Burtron's actions were unjustifiable and violated Ms. Eve Kincaid's constitutional rights.

196.      Officers McCorkle, Thomas, Harrel, and Does 1-10, and each of them, were certainly familiar with the concept of free speech.

197.      Officers McCorkle, Thomas, Harrel, and Does 1-10, collectively or individually, could have intervened to prevent the harm from occurring, but they did not.

198.     Officers McCorkle and Thomas could have refused to "just get [Ashley Kincaid Eve] out and detain her."

199.     Officers McCorkle, Thomas, Harrel, and Does 1-10, collectively or individually, could have advised Burtron that Ms. Kincaid Eve had *not* used her door to batter one of them, but they didn't.

200.     Officers McCorkle, Thomas, Harrel, and Does 1-10, collectively or individually, could have advised Burtron that Ms. Kincaid Eve was not suspected of criminal activity, so they did not have the right to "just get her out and detain her."

201.     Officers McCorkle, Thomas, Harrel, and Does 1-10, collectively or individually, could have refused to corroborate Burtron's trumped-up PC story, but they didn't.

202.     Officer McCorkle could have refused to write a false narrative in his PC affidavit against Ms. Kincaid Eve, but he didn't.

203.     Officer Harrel could have used his supervisory authority to tell Burtron that Ms. Kincaid Eve was well within her rights to give legal advice to the driver of the vehicle and that she could not be punished for doing so, but he didn't.

204.     Officer Harrel could have used his supervisory authority to tell Burtron and McCorkle they did not have the right to detain her before she had been suspected of criminal activity.

205.     At several steps along the way, these defendants had the opportunity to do the right thing – to intervene to protect the constitutional rights of Ms. Kincaid Eve and Ms. Wilson – but they didn't.

206.     Ms. Kincaid Eve suffered damages as a result of these defendants'
willingness to go along with, and failure to intervene to stop, Burtron's unconstitutional
actions.

### Count 5: Violation of Indiana Constitution
(*Kincaid Eve v. All Defendants*)

207.     Plaintiff incorporates the foregoing paragraphs as though fully restated
herein.

208.     When the Officer Defendants prevented Ms. Kincaid Eve from providing
her client with legal advice and invented a reason to arrest her when she tried to do so,
they deprived Ms. Kincaid Eve of her right to be free from unreasonable seizure, as
guaranteed to her under Article 1, Section 11 of the Indiana Constitution, and they
interfered with her freedom of thought and speech, as guaranteed to her under Article
1, Section 9 of the Indiana Constitution.

209.     Defendants City of Westfield, WPD, and Joel Rush were responsible for
the actions of their individual officers.

210.     Ms. Kincaid Eve seeks only equitable relief under this Count.

### Count 6: Violations of the 5th,  6th , and 14th Amendments to the U.S. Constitution
(42 U.S.C. § 1983)
(*Wilson v. Burtron, McCorkle, Thomas, Harrel*)

211.     Plaintiffs incorporate the foregoing paragraphs by reference as though
fully restated herein.

212.     Defendants Butron, McCorkle, Thomas, and Harrel denied Ms. Wilson the right to counsel by arresting her lawyer for attempting to represent her during a criminal investigation.

213.     Defendants Burtron, McCorkle, Thomas, and Harrel violated Ms. Wilson's 5th and 6th Amendments regarding her right to counsel by arresting her lawyer, and prohibiting her from having contact with her lawyer during a custodial interrogation.

214.     Defendants Burtron, McCorkle, Thomas, and Harrel violated Ms. Wilson's Sixth Amendment right by arresting her lawyer during a criminal investigation.

215.     Ms. Wilson's right to counsel during a custodial interrogation was  clearly established at time of her arrest.

216.     Ms. Wilson's right to counsel during a criminal investigation is clearly established by the Fifth and Sixth Amendments to the United States Constitution.

217.     The denial of this right caused Ms. Wilson to receive harsher consequences, including an automatic license suspension as a result of a "refusal" to take the certified breath test.

### Count 7: Violations of the 1st Amendment to the U.S. Constitution
### (42 U.S.C. § 1983)
(*Wilson v. Burtron, McCorkle, Thomas, Harrel*)

218.     Plaintiffs incorporate the foregoing paragraphs by reference as though fully restated herein.

219.     Ms. Wilson has the right to freedom of association.

220.     This includes the right to associate with and seek advice from lawyers of her choosing.

221.     Defendant Burtron, assisted by Defendants McCorkle, Thomas, and Harrel interfered with Ms. Wilson's right to freedom of association when they detained her lawyer.

222.     Ms. Kincaid Eve's "side-of-the-road lawyering" is protected speech under the First Amendment.

223.     At the time of this violation, Ms. Wilson was not yet under arrest

224.     Nor had officers indicated to her they had probable cause to arrest her.

225.     Defendants McCorkle, Burtron, Thomas, and Harrel violated Ms. Wilson's First Amendment right to freedom of association when they detained and punished her friend and lawyer for attempting to give Ms. Wilson legal advice while she was being interrogated by the police.

226.     These defendants' actions in detaining and arresting Ms. Wilson's lawyer were meant to deter protected First Amendment activity then and in the future.

**Count 8: *Monell* Violations of the U.S. Constitution (42 U.S.C. § 1983)**
(*Wilson v. City of Westfield, WPD, and Joel Rush*)

227.     Plaintiffs incorporate the foregoing paragraphs as though fully restated herein.

228.     Defendants City of Westfield, WPD, and Joel Rush lacked adequate policies and procedures to protect the Constitutional rights of those interrogated by the Police.

229.     Defendants City of Westfield, WPD, and Joel Rush lacked adequate policies and procedures to protect the First Amendment rights of citizens.

230.　　Defendants City of Westfield, WPD, and Joel Rush lacked adequate policies and procedures to protect the Fourth Amendment rights of citizens.

231.　　Defendants City of Westfield, WPD, and Joel Rush lacked adequate policies and procedures to protect the Fifth Amendment rights of citizens.

232.　　Defendants City of Westfield, WPD, and Joel Rush lacked adequate policies and procedures to protect the Sixth Amendment rights of citizens.

233.　　Defendants City of Westfield, WPD, and Joel Rush maintained a custom or practice of allowing their officers to be under-trained, under-prepared, and/or overly hostile and aggressive.

234.　　It was dark outside when only male officers responded to a situation involving only females.

235.　　The male to female, police to suspect ratios were highly intimidating and caused duress.

236.　　Arresting Ms. Wilson's lawyer in front of her was highly intimidating and caused extreme duress.

237.　　Defendants City of Westfield, WPD, and Joel Rush lacked adequate policies and procedures, or lacked staffing to support appropriate policies and procedures, to ensure that female officers responded to situations involving female suspects (or female passengers in cars, as the case may be).

238.　　Defendants City of Westfield, WPD, and Joel Rush's policies, practices, and customs (and/or lack thereof) violated Ms. Wilson's rights under the First, Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.

239.     Ms. Wilson was damaged by these defendants' policies, practices, and customs, and/or lack thereof.

### Count 9: Failure to Intervene (42 U.S.C. § 1983)
*(Wilson v. McCorkle, Thomas, Harrel, Does 1-10)*

240.     Plaintiffs incorporate the foregoing paragraphs as though fully restated herein.

241.     Officer Burtron can be seen and heard on the recording denying Ms. Wilson the right to have her lawyer present during a criminal investigation.

242.     Officers McCorkle, Thomas, Harrel, and Does 1-10 knew that Officer Burtron was fabricating probable cause against Ms. Eve Kincaid so that she could be arrested because they didn't want to do this "side of the road lawyering."

243.     Officers McCorkle, Thomas, Harrel, and Does 1-10 knew that Officer Burtron did not want Ms. Kincaid Eve to give Ms. Wilson legal advice during his ongoing criminal investigation.

244.     Officers McCorkle, Thomas, Harrel, and Does 1-10, and each of them, knew that Officer Burtron's actions were unjustifiable and violated Ms. Wilson's constitutional rights.

245.     Officers McCorkle, Thomas, Harrel, and Does 1-10, and each of them, were certainly familiar with the concept of the right to a lawyer and the right to remain silent.

246.     Officers McCorkle, Thomas, Harrel, and Does 1-10, and each of them, were certainly familiar with the concept of free speech.

247.     Officers McCorkle, Thomas, Harrel, and Does 1-10, collectively or individually, could have intervened to prevent the harms from occurring, but they did not.

248.     Officers McCorkle, Thomas, Harrel, and Does 1-10, collectively or individually, could have informed Officer Burtron that Ms. Wilson had the right to have Ms. Kincaid Eve present during a criminal investigation.

249.     Officers McCorkle and Thomas could have refused to "just get [Ms. Kincaid Eve] out and detain her" to prevent the "side of the road lawyering."

250.     Officers McCorkle and Thomas collectively or individually, could have advised Officer Burtron that Ms. Kincaid Eve had *not* used her door to batter one of them, but they didn't.

251.     Officers McCorkle, Thomas, Harrel, and Does 1-10, collectively or individually, could have refused to corroborate Burtron's trumped-up PC story, but they didn't.

252.     Officer McCorkle could have refused to write a false narrative in his PC affidavit against Ms. Kincaid Eve, but he didn't.

253.     Officer Harrel could have used his supervisory authority to tell Burtron that Ms. Wilson had the right to both consult and have a lawyer present during a criminal investigation.

254.     At several steps along the way, these defendants had the opportunity to do the right thing – to intervene to protect the constitutional rights of Ms. Kincaid Eve and Ms. Wilson – but they didn't.

255.     Ms. Wilson suffered damages as a result of these defendants' willingness to go along with, and failure to intervene to stop, Burtron's unconstitutional actions.

## V.     PRAYER FOR RELIEF

Plaintiffs pray that the Court will enter judgment in their favor and against the Defendants, declare the Defendants' conduct unconstitutional, and award Ms. Kincaid Eve and Ms. Wilson damages in an amount to be determined at trial, including punitive damages, attorneys' fees pursuant to 42 U.S.C. § 1988, and for all other relief just and proper in the premises.

## VI.    JURY DEMAND

Plaintiffs demand a jury on all issues and matters so triable before this Court.

Respectfully submitted,

*s/ Jonathan Little*
Jonathan Little #27421-49
Annemarie Alonso #30506-06
Saeed & Little, LLP
133 West Vermont Street, #189
Indianapolis, IN 46204
jon@sllawfirm.com
annie@sllawfirm.com
(317) 721-9214
Attorneys for Plaintiff